# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE No. 15-20805-CR-HUCK

UNITED STATES OF AMERICA,

v.

GUIDO ZIRIO,

      Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON
## DEFENDANT'S MOTION TO SUPPRESS

Defendant Guido Zirio is charged with a conspiracy to possess with intent to distribute 3,4-Methylenedioxymethcathinone, also known as methylone, and informally known as "molly" or MDMC, in violation of 21 U.S.C. Section 841(b)(1)(C). He filed a Motion to Suppress "Statements and/or Admissions." [ECF No. 21]. The Government filed a Response in Opposition. [ECF No. 25]. United States District Court Judge Paul C. Huck referred the Motion to Suppress to the Undersigned. [ECF No. 27]. On January 6, 2016, the Undersigned held an evidentiary hearing on the Motion to Suppress. [ECF No. 26].

At the end of the hearing, the Undersigned issued an *ore tenus* Order requiring Zirio and the United States to each file a list of authorities on one specific issue, and I followed that up with a written, post-hearing administrative Order. [ECF No. 28]. In my oral ruling and in the follow-up written order, I noted that I would be recommending

that the District Court reject Zirio's argument that he made statements *before* being advised of his *Miranda* rights. The United States filed its list of authorities [ECF No. 29]. Zirio filed a response, indicating that, given the Undersigned's ruling on his underlying argument about *Miranda*, he is not aware of additional authority to support his argument that the officer's comments rendered his statements involuntary.[1] [ECF No. 31].

For the reasons outlined below, the Undersigned **respectfully recommends** that the District Court **deny** Defendant's suppression motion.

## I.      Defendant Zirio's Hearing Testimony

Zirio, a 23-year-old high school graduate, testified as follows:

On the afternoon of January 23, 2014, he was a passenger in a car driven by Jorge Marin, a friend. Marin said he was going "somewhere" to pick up something. Marin drove to a parking lot, parked the vehicle and stepped out. He did not see where Marin went (because he did not look and because Marin walked behind the car) and he stayed in the car for approximately ten minutes. At that point, police officers in plain clothes approached the car with their guns, dragged him out of the car and arrested him.

He was taken to the Coral Gables Police station and placed and handcuffed to a chair in a small room. He was left alone in that room for approximately twenty minutes.

---

[1]      The written, post-hearing Order noted that, "[i]f there are no authorities addressing the issue, then the party shall file a one-sentence notice stating that there are no relevant authorities." [ECF No. 28].

Three law enforcement officers entered the room, with DEA Special Agent Joseph Kilmer serving as the lead agent. Kilmer told him that he was in a lot of trouble because Marin had told the officers (in a separate interview room) that Zirio gave Marin the money to buy a kilo of MDMA.  Kilmer told him that he was facing 10 to 15 years in prison and needed to cooperate in order to get out of legal trouble. Kilmer told him that he would help him if he would help Kilmer in the criminal investigation. Kilmer was not specific about the nature of the help which he would provide in exchange for the cooperation.  Kilmer was calm and professional and was not yelling.

Zirio answered the law enforcement officers' questions about where he was going, what he was doing in the car, why he was in the car and where the drugs were to be taken next. Basically, Zirio said he did not know anything about a drug transaction.

The agents told Zirio that they thought he was lying when he said he had nothing to do with the drug deal.

The three agents left the room for a few minutes and then returned. Zirio saw a small grey digital tape recorder, but did not know if it was ever turned on or if the agents put it on the table before or after they left the room and returned.  Zirio could not recall if Kilmer or either of the two other agents told him that they wanted him to repeat his answers on tape.

In any event, after Zirio answered questions and the agents returned after a brief departure from the interview room, Kilmer took out a card and read Zirio his *Miranda*

3

rights. Zirio then told Kilmer that he no longer wanted to speak, but Kilmer continued to ask questions. Zirio did not provide answers.

## II.      Agent Kilmer's Hearing Testimony

Kilmer is a recently-retired DEA Special Agent, having spent 31.5 years with the agency, 28.5 of which were in South Florida. Kilmer always reads the *Miranda* rights form from the same DEA card which he keeps in his wallet. He has been following the same procedure for his entire DEA career: he reads each sentence out loud and asks the defendant or suspect to verbally acknowledge his understanding of each right.  He stops after each sentence to obtain the acknowledgement.

Moreover, Kilmer has *never* audiotaped or videotaped an interview with a suspect or defendant in his career. In fact, it was standard DEA policy to **not** record interviews until early 2015, when the policy changed.

Although law enforcement officers from other agencies were involved in the reverse sting operation involving Marin and Zirio that day, DEA was the lead agency, which means it "called the shots." Therefore, the officers followed the DEA procedure, which, as noted, was to not record interviews.

The investigation/reverse sting at issue involved an informant and an officer working in an undercover role. Phone calls and text messages were used to make the arrangements for the molly purchase. Kilmer opined that the money was likely not Marin's because he did not have it in his possession. In addition, the informant told

4

Marin that he would need to tell his "partner" to "man up" and let go of the money for a few minutes in order to complete the transaction.

Marin arrived at a parking area on S.W. Eighth Street in a small white truck, with another person in the front seat. Marin, who was driving, left the parked car and walked approximately 30 feet to the undercover car. Although the windows in Marin's vehicle were tinted, the passenger could have seen where Marin went if he would have looked to his right, through the passenger window.

After Marin entered the undercover car, money was exchanged and the arrest signal was given. Kilmer did not see Zirio being arrested by other officers in the other car. Agents transported Marin and Zirio to the Coral Gables Police station in separate cars and placed them in separate rooms.

Kilmer did not know if the interview rooms were equipped with any recording equipment. He did not discuss with other agents or officers the possibility of recording the interviews. Because the DEA was the lead agency and because the officers from the other agencies had worked with DEA long enough to know its do-not-record policy, the topic never came up.

Kilmer viewed Zirio as the likely buyer, though he could have been a middle man for someone else.

The agents interviewed Marin first and left Zirio in another interview room by himself. Marin was highly emotional and refused to identify others involved in the transaction because he did not want to "rat anyone else out."

After completing the Marin interview, which lasted for 15 or 20 minutes, the agents went to the other interview room and uncuffed Zirio. Kilmer took out his DEA Form 13-A *Miranda* rights card, read each right to Zirio and obtained his verbal acknowledgement after every sentence. Kilmer did not even obtain any background information from Zirio until after he read Zirio his rights and until Zirio acknowledged them.

Zirio said he was willing to answer questions.

Kilmer told Zirio he was under arrest for violating federal narcotics laws and that he would be photographed. He told Zirio that he hoped Zirio would help himself out by identifying customers and by providing other information. He told Zirio he was looking at prison time, but did not mention any specific estimate about the amount of jail time at issue. Kilmer said it is his practice to never proffer a specific prospective jail sentence when interviewing a defendant or suspect. He would never have told Zirio he was confronted with a 10 or 15-year sentence because that seems significantly too harsh and because he did not know Zirio's criminal history background.

Kilmer also told Zirio that he would advise the prosecutor if he helped and cooperated.

6

Zirio denied knowledge of any drug trafficking activity and also denied knowing that Marin was taking him to pick something up.

Kilmer explained that Zirio seemed remarkably calm, a view echoed by another law enforcement officer participating in the interview. Kilmer told Zirio he did not believe him. Zirio was told that people do not simply show up at drug deals if they are not involved. Zirio was also told that it was unusual for a suspect like him to be so calm. At that point, Zirio began acting upset, but it was not convincing.

Zirio said he had only two or three phone calls with Marin that day and had no text message exchanges. He refused to give the agents consent to look at his cell phone, however.

Zirio never cut off the questioning or advised that he no longer would answer questions, but it soon became clear to Kilmer that Zirio would not be of any help in the investigation, so he stopped speaking with him. Kilmer contacted a federal prosecutor working with him on the investigation and the AUSA advised him to release Zirio.

### III.    Detective Rupert Peart's Hearing Testimony

Rupert Peart has been a police officer with Miami-Dade Police for 15 years. He was present at the arrest and during Zirio's interview. Here is his relevant testimony:

Kilmer pulled out a card from his wallet and used it to read the *Miranda* rights to Zirio. This happened before any questioning.

No tape recorder was present.

Zirio agreed to speak after his *Miranda* rights were read to him. Peart personally does not record interviews even though it is an option.

Peart participated in some of the questioning and he deemed Zirio's answers to be incorrect and unbelievable because they did not make sense. He did not recall hearing Kilmer tell Zirio that he was in deep trouble, though he does remember Kilmer saying that he would make Zirio's cooperation known to the prosecution.

**IV.     Analysis**

The assessment of Zirio's *Miranda* violation is a simple issue of determining which version is credible.  The parties do not dispute the applicable law.

I find the testimony of Special Agent Kilmer and Detective Peart to be completely credible. They were forthright, direct and comfortable. I found no reason to disbelieve any of their testimony. To the contrary, having closely examined their demeanor, I find that their testimony is factually correct and I therefore find that they gave Zirio his *Miranda* rights before he began answering any questions. Consequently, there is no reason to suppress his statements (even if they are false) for a purported *Miranda* violation.

 I now turn to Zirio's second argument: that his answers were not voluntarily provided, even after acknowledging his *Miranda r*ights, because the agents induced, tricked or pressured him into answering questions by advising that he was in trouble and that he could help himself by cooperating.

The officers do not deny that Kilmer made these statements. These are standard, garden-variety comments which officers make to suspects in an effort to obtain their cooperation in a criminal investigation. They do not mean that his post-*Miranda* statements were involuntary because of unlawful inducements. *United States v. Nash,* 910 F.2d 749, 752-53 (11th Cir. 1990) (Customs Service agent did not make an unlawful inducement when he promised to make defendant's cooperation known to the federal prosecutor and gave no guarantee of a reduced sentence because "telling the defendant in a noncoercive manner of the realistically expected penalties and encouraging him to tell the truth is no more than affording him the chance to make an informed decision with respect to his cooperation with the government."); *see also United States v. Bowleg,* 567 F. App'x 784, 794 (11th Cir. 2014) (agent is permitted to discuss potential penalties with a defendant during an interview without affecting the voluntariness of later statements); *United States v. Hernandez-Perez,* No. 5:08-cr-34, 2008 WL 4200130, at *8 (M.D. Fla. Sept. 12, 2008) (advising a defendant of the range of possible penalties is not unlawful "because a law enforcement officer is permitted to discuss with a defendant realistic penalties for cooperating versus non-cooperative defendants" and a promise to advise the Court of cooperation "does not constitute coercion").

The Undersigned therefore rejects Zirio's second theory and recommends that the District Court **deny** the suppression motion.

**OBJECTIONS**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the Parties have

**7** days after being served with a copy of this Report and Recommendations to serve and

file written objections, if any, with the District Court. Each Party may file a response to

the other Party's objection within **3** days of the objection.[2] Failure to file timely

objections shall bar the Parties from a de novo determination by the District Court of an

issue covered in this Report and Recommendations and bar the Parties from attacking

on appeal the factual findings contained herein. *Resolution Trust Corp. v. Hallmark*

*Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) (citing *LoConte v. Dugger*, 847 F.2d 745,

749-50 (11th Cir. 1988)).

**RESPECTFULLY RECOMMENDED,** in Chambers, in Miami, Florida, January

14, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[2]      Given the upcoming trial schedule, the Undersigned is shortening the time in which the parties have to file objections and responses. The Undersigned is authorized to adjust the deadlines, and I conclude that this deadline modification is appropriate and not unduly prejudicial. This is a three-witness hearing which lasted less than two hours, the factual issues are comparatively simple and straightforward, the legal issues are not complex, and defense counsel already briefed the issue before the hearing.

<u>Copies furnished to:</u>
The Honorable Paul C. Huck
All counsel of record